Good morning all. We will be hearing one case this morning, and that is Qatanani v. Attorney General, and we will begin with you, Mr. Isakson. Your Honors, my name is David Isakson. I represent the petitioner Mohamed Qatanani. I'd like to reserve six minutes of my time for a little granting that has been expanded. This case is about whether the Board of Immigration Appeals has to follow the rules, and here they didn't in multiple ways. I'll start first with their violations of the fact-finding regulations, which was what we addressed first in our reply brief. The immigration judge heard... Can we maybe turn to the certification question first?  I want to make sure I understand how this was... I understand your argument here. I want to understand how you presented this argument before the BIA, and whether it was properly raised, and therefore exhausted, such that we can consider it. Could you walk me through that? Yes, Your Honor. So, before the BIA, the petitioner argued within the confines of the regulation that the certification was inappropriate. The BIA has interpreted its own regulation in a case called Matter of Liadov, has said there need to be exceptional circumstances. The petitioner argued below that there were not exceptional circumstances. That is, in our view, the kind of argument the petitioner was permitted to make below. Why couldn't you make the... what you might call the as-applied challenge, where you say, hey, look, applying it here is going to work a particular hardship, and therefore isn't an exceptional circumstance? Basically the same argument you make for us now. I understand you can't make the legal argument, you can't challenge the rule, but why not the operation of the rule, which seems to be what you're doing here? So, if the argument were just that, as Your Honor says, it was an exceptional circumstance, that might have been something, in hindsight, that could have been done below. But as Your Honor says, the legal argument that the rule exceeds the authority granted under the statutes is not something that the BIA can consider. The BIA has made this, I think, quite clear in Matter of Anselmo and Matter of Ponce de Leon Ruiz, and to the extent that Your Honor is concerned about the difference between an as-applied and a spatial challenge, the BIA has also said, in the context of constitutional challenges, which Anselmo and Ponce de Leon Ruiz make clear that it considers directly analogous to statutory challenges for regulation, the BIA has said, for example, in Matter of Ramos, 15 INN death, 671, in 1976, that it doesn't entertain constitutional challenges, even when it's doing a, quote, as-applied challenge. Similarly, in Matter of H, 3 INN deaths, 411. Challenge here, a spatial challenge or an as-applied challenge to the regulation? It's an as-applied challenge to the regulation, Your Honor. There are circumstances under which the certification regulation could have been lawfully applied. The BIA does have, you know, some general authority to set the rules of its proceedings, and if it's not using that authority in a way that runs headlong into a statute, then it could say, you know, for example, if there hadn't been a grant of permanent residence, which comes up more often if relief is denied and somebody's seeking to certify a late appeal, or perhaps if some form of relief had been granted that doesn't come with a specific statutory provision like 1256A, AUSC 1256A, laying out exactly what has to be done to take away the relief once it's been granted, that you have to find that the person was not, in fact, eligible for adjustment. But here... And so just like, to be clear, what you're not arguing, you're no longer raising exceptional circumstances or the parameters of that decision, right? Correct, Your Honor, because that's a BIA discretionary kind of more fuzzy determination under the regulation that it would have been more difficult to successfully challenge here as kind of a general abuse of discretion under LEADOC. But we do think that it's exceeding their statutory authority as applied to these circumstances because the effect is that they've taken away a status that, if you accept our arguments, had attached historically prior to their exercising the certification power, and they've done it without meeting the statutory requirements of AUSC 1256A, that there be rescission proceedings and that they confirm that the person was not, in fact, eligible for adjustment, and without meeting the alternate requirements of AUSC 1227A1A for new removal proceedings based on the person being inadmissible at the time of adjustment or admission. I understand that you're looking to 1256 as to these alternate remedies that are provided when someone has become a lawful permanent resident. But that begs the question because we need to determine if and when there was a change of status. And specifically when, if at all, the immigration judge's order became final and operative. So can you speak to that in terms of both the statute and the regulations? Yes, Your Honor. The statute does not prescribe a specific time of effectiveness. And so the Department of Justice has promulgated these regulations, which we've cited in the brief, HCFR 1003.38B and 1003.39, that together make clear that there are 30 days for it to file an appeal, after which it becomes final. And those regulations do make reference to certification, but they don't, as we said in the brief, enable the BIA to travel backwards in time. As of that 31st day, there had been no certification, there had been no appeal. So the operation of the regulations is that as of that 31st day, the immigration judge's order becomes effective and my client becomes a lawful permanent resident. And I think one can see that that's right by trying to figure out what, under the government's theory, the alternative is. There is, as far as I can tell, no alternative date under which, on their theory, he wouldn't have become a lawful permanent resident without some other action, for example, by DHS, which can't be the case because the regulations say the immigration judge has exclusive jurisdiction over the adjustment application. But as the government points out, there's some additional steps that are specified to take place, including the assignment of a visa number, the reduction by one, a question of whether both medical records and medical exam and fingerprints have been updated. So why aren't there those additional things that need to be addressed before the judge's order could become final, even with certification still looming in the wings? So I think it may make sense to take those one at a time, Your Honor, because I think the answer with respect to the fingerprints issue, medical and so on, is a bit different than the answer with respect to the visa number. On the visa number front, as we pointed out in the reply brief, visa numbers are available, and the record here makes clear that they were. Even USCIS, part of DHS, has said that where this administrative step that happens in an ideal world of the State Department saying, yes, we're fine with this too, hasn't happened. The person is lawfully admitted for permanent residence for purposes of naturalization. USCIS says that in their policy manual. We've cited it in our reply brief. And that makes sense because if you look at the statute, 1255B is described as the thing that happens after the grant of adjustment of status. The statute gives the power over the adjustment process to the Attorney General, which sometimes includes the Department of Homeland Security, which is why we have to look to the regulations for that division of authority. But statutorily, the Attorney General never includes the Secretary of State. It's not consistent with the statute to read the regulations as granting the Department of State this sort of case-by-case ex ante veto on a particular adjustment because 1255A says that it's the Attorney General granting that adjustment. What the Secretary of State does is keep track of these visa numbers and let everybody know if they're available. And there's a chart. And the visa bulletin made clear that numbers were available for somebody with this priority date. And USCIS, as I say, has acknowledged that under those circumstances, even if there isn't sort of a specific permission slip as to this individual person, the person's lawfully admitted for permanent residence. So I think that's our argument as to the visa number issue. I'm happy to answer if Your Honor has further questions or else I can move on to the other two subparts. Well, as to that, say it was a case where it wasn't apparent that there was a visa available. In that circumstance, would it still be your argument that upon the expiration of 30 days that the immigration judge's order became final, that the application had been approved? Yes, Your Honor, but it would have become final in error. He would have been not, in fact, eligible for adjustment in your hypothetical. And therefore, that would have been a proper circumstance in which to exercise the authority of AUSC 1256A, the rescission statute, and to say when that error was discovered he was not, in fact, eligible for the grant of adjustment because the immigration judge granted him adjustment at a time when he should not have. And therefore, we can exercise our rescission authority to rescind that adjustment. I don't think that would have meant that the grant wasn't final in the first place, but it would have meant that it would have been final in error. He would not, in fact, have been eligible. And therefore, rescission would have been appropriate. So I understand your argument. You do not dispute that, as written, the regulations do not impose a limitation temporarily on the BIA's ability to certify. Rather, your argument is that just can't be right, as written, because it would conflict with statutory authority. That's correct, Your Honor, and that's why we think it was a non-exhaustible argument below because the BIA has made quite clear that it has to read the regulations as written, that it can't hear statutory challenges to a regulation any more than it can hear constitutional challenges to a statute. And as I say, with constitutional challenges, it's made quite clear, whether as applied or on its face, it still can't hear them. Now, I understand your focus on the statute, but at page 21 of your brief, you also made reference to due process. Are you also raising a due process argument? I think the due process goes to the interpretation of the statute. That's Sharkey v. Quarantio, if I remember the site Your Honor's talking about. The Second Circuit has pointed out that these provisions that are embodied in the statute are likely required as a matter of due process. But we're not saying the statute doesn't go far enough and so he needs more due process. We're saying the statute is in part there to protect these due process rights and that's one of the reasons it has to be strictly followed. Understood. Let's talk then about the fingerprints in medical exams, because it appears that the immigration judge, at least in the 2017 transcript, is making reference to those having been completed. We have certain documents in the record at 2035 to 2051. What are those? The fingerprints have to be renewed in some way, and DHS will sometimes attest, people don't usually anymore have to go get their fingerprints physically taken again back at that time. It may have been a requirement sometimes. I think though that the overarching point as to the fingerprints and biometrics is that that would at most be a ground for rescission proceedings that have never been initiated or if the BIA could exercise its 1256A authority under the certification regulation, maybe I'm not sure this is right, maybe they could have said in their decision, under our rescission authority, we think you weren't eligible because X and Y, but they didn't say any of that. The BIA has not relied upon, and perhaps absent rescission proceedings could not rely upon the question whether the immigration judge ought not to have granted because of the medical exam and or the fingerprint issues that if they had wanted to raise and potentially remand for an updated medical or updated fingerprints if they thought it was necessary, they could have done that under their rescission authority, but they've not even asserted the BIA that he's not eligible for these reasons. So I think there'd be a Chenery problem with affirming their decision on that basis. Well, we have in the record at those pages they just mentioned, medical records and fingerprints. Yes. Are those, would those qualify for purposes of eligibility or was there another update that was needed? So the question that I guess the government is raising is whether they needed to be updated. I agree with your honor. They're in the record already. The immigration judge and the board have not raised any argument about their being out of date. The rules regarding when medicals become out of date are constantly changing. At the moment, I believe the USCIS rule is that they never expire. This is not something that we can kind of look at without any basis in the record and say, oh, the Board of Immigration Appeals was correct in exercising certification without meeting the criteria for rescission because there's this argument it could have made it but didn't, that might or might not have worked. I'm not so sure it would have because medicals now last forever and fingerprints, the physical fingerprints obviously last forever. The government may or may not have rerun them or may or may not have been required to rerun them. On this record, we just don't know. But I don't think that's the basis to find that the adjustment wasn't granted in the first place. At most, it would be an issue to address in the rescission proceedings that were never commenced. Let me ask you about 1003.1c. The version that was enforced at the time that there was the purported certification here allowed the IGA, the DHS officer, the secretary or the board to certify. In your view, which of those happened here? The BIA certified to itself as a way of accepting DHS's late appeal, maybe there could be an argument that DHS... I don't think there could be an argument that DHS certified. I think that occurs when the regulations have a path from DHS to the BIA. So where there's an I-130 petition, for example, adjudicated by DHS, the appeal goes from DHS to the BIA. I think the reference to DHS certifying is in the context where the appeal is running from DHS to the BIA. I think the people who certified here are the BIA. Clearly, the immigration judge didn't, and I think it was in excess of their statutory authority. If Your Honors don't have more questions about the certification, though, I do want to make sure I address the fact... I actually do have another question about certification. So, at the beginning of your argument, you said 1003.38 and 1003.39 together make clear that finality comes on the 31st day when there's a no appeal. But I understood your answer to Judge Mady's question to be saying that you are not making a textual argument about the language of the reg. So can you explain? Your Honor, I'm sorry for any confusion. What I'm saying about the regulation, the only regulation as to which I'm saying that is the 1003.1c, the certification regulation itself. We think that if it were completely valid under all circumstances, then just as the government has said in its brief, what the BIA did here would work. The problem is that the regulation is not completely valid under all circumstances. We're textually following 1003.38 and 1003.39 to find out what happened on day 31. That's part one of our argument. Then we're saying 1003.1c operates to try to undo what happened on day 31. And we're not disputing that 1003.1c, if allowed to give its full operation, its full extent, would have that effect. But it can't statutorily have that full effect because that would be ultra-virus the BIA's powers under a USC 1256a and a USC 1227a1a. There are two separate decisions though, right? I mean, 1256 is dealing with rescission. The rule is dealing with the question of discretion. I mean, one is to say, were the elements of adjustment met in the first place or were they wrong? The other is saying even if those elements were met as a matter of discretion, is adjustment warranted in the decision of the attorney general and the executive, right? I understand how you're framing it and so framed, I see the tension you pointed to, but it is possible to frame it the other way, which is to say, there isn't really ever finality in an immigration decision. There are tiers and steps that come at which point status changes, but nothing is ever final, even including naturalization. There are always grounds by which the sovereign can go back and say, the grace by which we have extended your permission to remain in the country has changed. I don't think you can test that. It really comes down to whether we see a kind of judicial finality descending by operation of a statute that doesn't deal with the circumstances of discretionary adjustment or if we look at finality as merely a tiered process by which the executive, exercising its sovereign power, continually re-evaluates the status of this person's request for permission to remain in the country. I think my response to that, Your Honor, is that Congress has spoken to some of these tiers. Your Honor pointed out for denaturalization, for example, there's a process. The executive can't just say, well, we naturalized you and the exercise of our discretion under these regulations, we're going to denaturalize you. In fact, they tried that at one point and the Ninth Circuit struck down this argument that anything one can do, one can undo. Here, too, Congress has laid out rules in 1256A talking about the timeframe and the criteria. This person was not in fact eligible for adjustment of status. Congress probably could have passed a statute saying if it is concluded that the person was not, as a matter of discretion, deserving of adjustment of status, these are the procedures you follow to take it back after it's been granted, but that's not what they said. The executive acting on its own can't go and do that where Congress has set criteria that do preclude what it says. Assuming it occupies the field to some extent. This is just so I think we're all clear. The argument you're advancing is novel. I mean, we have no decision we can look to, not only by this court, but by any court that has said the 30-day time limit for appeals is actually also a 30-day limit on the certification of party when it comes at least when it comes to adjustments of status. That's correct, Your Honor, but I'm also not aware of any case upholding the BIA's effort to do this. I think what you're finding is that this is just not something, as far as I'm aware, and I did research this, that the BIA has ever tried to do before. The only approximate analogy I'm aware of is a case where the Attorney General tried to certify a long-ago grant of asylum, which may raise other statutory issues, but not 1256A, which is specifically about adjustments of status. So I think the answer is there's no precedent either way. I understand you're looking to the remedies that Congress did provide for someone who has adjusted status, but as we're looking at this ex-ante as to whether and when there is the adjustment of status, I want to make sure I understand your argument because you've talked a bit about 1256A, but I understood from your brief that another textual argument that you were making was a conflict with 1255B, with the language there about upon approval of an application for adjustment made under subsection A, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for adjustment of status is made and the Secretary of State shall reduce by one the number of preference visas. Just so I'm clear, is that also part of your argument? That's correct, Your Honor. That is part of our argument and that I think defeats this idea that the Secretary of State had to give some sort of ex-ante case specific permission in order for this grant to take effect because the statute as Your Honor just read it is very clear. The Attorney General grants the adjustment of status and then he shall tell the Secretary of State to reduce the numbers by one and the Secretary of State shall do it. It doesn't say he shall get the Secretary of State's permission before granting the adjustment of status. I agree, Your Honor. That's a very important textual point in terms of the sequence and in terms of why we shouldn't read this as waiting for the Secretary of State. That's completely correct. Put another way, whatever discretion there might otherwise be, you're arguing that at the end of that 30-day period, we've got a statute kicking in with mandatory language about what the Attorney General and Secretary of State then need to do. Yes, Your Honor. So that's, yes, at the end of the 30 days. If the panel doesn't have further questions, I was hoping to at least briefly address the fact-finding regulation issues unless Your Honors are all convinced of the merits of those and I don't need to spend time on them. If you would like them to be addressed, I'm happy to. We'll extend another 15 minutes on both sides. We have a lot of ground to cover and we appreciate that this is important for the government and for Dr. Kastanayi. On certification, in Morales-Morales, the BIA agreed that the 30 days was a claims processing rule and that equitable tolling could be used instead of this certification process to extend time. If we were to agree with you that the operation of 1255B meant that the Board couldn't certify an IG's grant of LPR status to itself after that time for appeal had run, would that also preclude the Board from using equitable tolling to extend the time for the order to become final? I understand, Your Honor. I think I have a few answers to that. One is that if the Court felt that this was potentially a live issue, I think the appropriate course would be to remand to the Board, explain that the authority they did exercise doesn't work, and then we can address with the Board whether the authority does work and, if necessary, be back before Your Honors. But I think my answer substantively would be that it wouldn't work at least if it were used, again, without meeting the criteria of 1256A. There may be a world, just as it's possible to conceive of a situation where they make clear that they're exercising their 1256A power through the certification regulation and meeting the criteria for it, although that is very definitively not what happened here. One can conceive of a decision where they say, we are applying the equitable tolling standard to determine whether it's appropriate to rescind the status of somebody who was not, in fact, eligible at the time of adjustment, et cetera. I don't think they could use equitable tolling to completely escape from the rescission statute and to say, we are going to take away the lawful permanent resident status of somebody who has it, who we are not prepared to say was not, in fact, eligible for adjustment, because that would create the same statutory problem as the certification regulation does. Congress has made clear that there are specific standards that have to be met if you want to take away the lawful permanent resident status of someone who has it. If you want to rescind it. If you want to rescind it, or if the other way to take it away is removal, right? We've acknowledged there are multiple possible mechanisms. Congress has provided two different mechanisms for taking away the lawful permanent resident status of someone who has it. They have not authorized a third mechanism of, we're not even going to address whether this person was not, in fact, eligible, but we think as a matter of discretion, he shouldn't have been given the thing that, as Her Honor has pointed out, is a statutory matter and also we find it as a regulatory matter, we already gave him. Again, this does assume, though, that the primary actor in this field is Congress as opposed to the executive, but I think the Constitution sets it the other way. I certainly understand Congress has written into this field and created standards that must be followed, but I don't know why that means we should be assuming that the executive's otherwise plenary power over the process of immigration doesn't exist unless Congress has affirmatively granted it, and so I hear what you're saying, there's a process they've outlined, numbers need to be assigned, minuses need to be put on the ledger, and of course that can all be undone, that's just a simple matter of procedure. I just still don't understand why it is that we should understand that only if Congress has spoken to it can the executive take any actions that otherwise we would have assumed the executive has always possessed as a matter of the inherent power to regulate immigration. So, Your Honor, I think my answer to that is that constitutionally the power to immigration stems largely from a combination of the power to establish a uniform rule of naturalization and the power to regulate foreign commerce, and both of those are powers of Congress. So, I think that Congress is actually the primary holder of the constitutional powers in this field. It has often authorized the executive to act with a fair amount of discretion, and so we have case law deferring to the congressionally authorized executive discretion. But the executive's unilateral powers under the Constitution in the field of foreign relations are not that broad. The president can recognize foreign ministers and receive ambassadors, so the president has some unilateral power over which government of a foreign country we recognize, but I don't think the president has ever had the unilateral power absent the statute to regulate immigration. When presidents, for example, have purported to put in place bars on entry under particular circumstances, that's under INA 212F until very, very recently. There is some, I agree, cutting edge effort, to use a value neutral term, by the current administration to assert that it has the unilateral authority also at the border, but that has never, so far as I'm aware, been upheld by a court. All of the previous case law deferring to executive discretion to do things like entry bans, that's under INA 212F, or where the executive has authority to exclude or admit somebody, that's because Congress has given them that authority. In the due process context, the Supreme Court has said that certain categories of aliens, not my client, only have the due process that Congress has given them, but I think I would push back respectfully, Your Honor, at the idea that the president has unilateral authority in this kind of field, separate from Congress's regulatory structure, certainly if there's tension with Congress's regulatory structure. Again, I'll ask the clerk to add, at this point, let's add 12 minutes. And to be clear, you don't begrudge the executive the discretion to pursue an action via rescission or a new action for removal. That's correct, Your Honor. If the executive meets the statutory criteria, Congress has authorized it to do either or both of those things. We just don't think they can proceed in a way that Congress has not authorized, and that is in tension with what Congress has provided. All right. My colleagues have other questions on certification. We'll give you this time to move on to the factors that were considered by the BIA. Yes, Your Honor. As to all four of those factors, we believe there were violations of the fact-finding regulations, either because there was overturning of the immigration judge's factual finding without proper clear error analysis, or the BIA finding facts on its own, or sometimes both. The first of these four has to do with whether my client was, as the BIA put it, intentionally not truthful in his application for adjustment of status. We think that in the 2008 immigration judge decision upon which the BIA purports to rely, the immigration judge makes quite clear, and we've quoted him repeatedly in the brief, that my client did not knowingly make a misrepresentation, that he had a reasonable belief that he was detained and not arrested. Right, but I don't see the BIA to be challenging that, aren't they saying? But he wasn't candid about the circumstances. Sorry, Your Honor. The BIA says he was intentionally not truthful. I think candid is a bit of a slippery word here, but I think when the BIA says intentionally not truthful, and when the BIA immediately after referring to candor, cites matter of Gomez-Beltran and matter of Bourbon, which illuminate what it means by candor, and when in those cases you have somebody who made false statements or was found not to testify credibly, reading that all together, I think it's fairly clear that when the BIA says he was intentionally not truthful, the most natural reading of that is they're saying he intentionally told a non-truth, was not truthful. Whereas when the immigration judge referred to candor, he was saying, you could have been more forthcoming. If you'd attached an extra page, we would have avoided a lot of trouble. That's different from saying you were intentionally not truthful. You are like the person who gave non-credible testimony. You are like the person who asked how many times he'd been arrested, first said once and only changed his answer after we confronted him with the proof of the other ones. So I think what the BIA is saying, it may be a subtle distinction, but I think it's a very important distinction as a matter of discretion, whether they should be looking at this just from the point of view of you could have been more forthcoming, you could have been more candid, as the immigration judge found. That may have been true in the 2008 immigration judge opinion. But by the 2020 immigration opinion on remand, the immigration judge was finding that DHS had established a material misrepresentation and that the failure to disclose the 93 detention in the West Bank and provide some further explanation had cut off a line of inquiry. So even though it's only the 2008 opinion that it cited, when we are evaluating whether the BIA was properly applying clear error review, don't we look to the record in its entirety, including the 2020 immigration judge opinion? Your Honor, I think from a Chenery perspective, it's important to rely on what the BIA relied on and to look to whether that was suitable. And I think that's particularly important here where we have reason to think this is not a typographical error. If the BIA had relied on the 2020 opinion, that would have opened up an entirely different line of analysis and attack because, remember, the 2020 opinion comes after the BIA on remand in 2009 more or less instructs the immigration judge to make certain of these findings and so if the BIA had, and it didn't, if the BIA had relied on the 2020 findings, then we would have had occasion to attack in our briefing the impropriety of their 2009 clear error analysis and this would have opened up an entirely different line of argument that, as far as I can tell, the BIA intentionally avoided getting into by relying solely on the 2008 decision that it had not itself influenced to avoid this sort of circularity and regardless of whether we can read their minds, I think Chenery teaches that the court should not be trying to, right? If the BIA has stated in its opinion, you know, this finding is justifiable because X, I don't think the court should be then looking to an entirely different source of possible support that the BIA didn't rely on because it's important that, you know, petitioners know which reasoning of the agency they're disputing. But you would agree that if we have to look at this as a substitution of fact-finding and not merely an assessment of the facts that are already established in the record, right? I mean, that, an assessment of the facts isn't new fact-finding, it's just characterization. That, I'm assuming you would agree if that's what this was, then that's that. It's not something that we can reconsider. So the semantic distinction is a very fine one here, Your Honor, but I do... This is all about semantic distinctions. I understand. I don't think they were simply describing facts that the immigration judges found because I don't think that, to the extent their text is ambiguous, I think their citations shed light on it. I don't think you can read their citations to Gomez, Beltran, and Bourbono as saying, yes, everything you said was true, but you should have said more because if that's the case, then why do you compare him immediately following your statement about candor to someone who, quote, made false statements? But Bourbono itself says lack of candor is in itself serves as an adverse factor, so I mean, why isn't that an appropriate citation for the proposition that the petitioner lacked candor? Because it's appropriate, but it helps shed light on what they meant by candor, and here this is somebody who didn't testify credibly in Bourbono, so that, I think, explains what they mean by candor. Moving on also, though, because there are three other similar errors they made, although I believe we only need to prevail on one of them in order to require remand as a result of the fact-finding regulation violations. The second one, the BIA says he's associated with individuals who support Hamas, even though the immigration judge made no such finding, and this isn't indisputably in the record. All we know is he lived in a different part of the same building with an imam who he ultimately insisted resign or else he would go, and that he shared an employer and that he was involved in fundraising for an organization that was later found to have at some point supported Hamas. Given the lack of clarity in the timeline, I think the BIA had to make a new finding of fact to conclude that, and as this Court's explained in Hashmi and the Second Circuit's explained in Padmore, they can't do that. But the burden is on your client to show eligibility. So if there's not, if there's uncertainty in the record about the timing of donations or the timing of fundraisers that were held, why doesn't that count the other way? If the immigration judge had said, I find that this may have happened because he hasn't proven otherwise, that would be different. But respectfully, Your Honor, I think one could say the exact same thing about Hashmi and Padmore, right? The burden was on Hashmi to show that he hadn't delayed his proceedings and was eligible for a continuance. The burden was on Padmore to show that he was eligible as a matter of discretion, for I believe it was cancellation of removal. It still doesn't work for the Board of Immigration Appeals to find, actually Mr. Padmore did these things for which he was arrested, even though the immigration judge had never so found. Actually, Hashmi caused the delay in his proceedings, even though the IJ had never so found, even though one could reframe both of those the same way, Your Honor, I think, and said, well, we, the BIA, find they haven't introduced sufficient evidence that they didn't commit these crimes or they didn't delay the proceedings. But that's the difference, right? In those cases, the BIA was kind of walking through the record and finding issues and then resolving them. Here, the BIA is just looking to the petitioner's own statements, acknowledgments, admissions, call them what you want, and deciding in its discretion that they showed a lack of candor. I don't see how that is the same as saying, well, there was A and B in the record, and we're going to have to go back into it and make a determination here. They did. They simply pointed to the same things that were already before the IJ, which seems discretionary. So, I think the point of disagreement is whether it was clear on the record before the IJ that there was such a meaningful association. I know the government says it doesn't have to be meaningful. Similarly, moving on to the third point, when the speech about a new intifada, the immigration judge there clearly found that this was peaceful, and there's substantial evidence in the record including some introduced by DHS showing that some uses of the word intifada can be peaceful, that the beginning of the first intifada, according to even DHS's own submissions, was. And then the BIA, without properly doing any, I would say, clear error analysis, without explaining why this is clearly wrong, has said, I think, flying in the face of Al-Ambayev, well, we disagree. We think that actually this was a call for violent uprising. And I don't think... I mean, we've had a lot of talk about semantics here. The BIA read the full dictionary definition. It made new... It didn't make a new fact-finding here. It simply said, well, the IJ read half the definition. We're going to read the full definition. I don't see how that's... How is that going back into the record to find new facts? As for the dictionary definition, Your Honor, I don't think the record shows that they were necessarily looking at the definition. The BIA looks something up online years later and seems to be assuming, oh, it must have said the exact same thing when the IJ looked at it years before. I don't think that's in the record. I also don't think it's appropriate to say my client was necessarily calling for violence because a dictionary says so when there is substantial other evidence and testimony in the record that would point to a peaceful interpretation and when there's substantial evidence pointing to my client's generally peaceful nature and honesty, etc., most of which the board didn't confront at all in their alleged clear air review and overturning. You would have at least a much stronger case to make if there had been a finding of intent by the immigration judge. But instead, the immigration judge said that the court's in no position to decipher what respondents' intifada would entail. Isn't that the IJ saying I'm not opining as to intent and instead looking to the dictionary definition? So the BIA, first of all, said that the IJ did find it to be peaceful and they overturned it. So I think there's a Chenery problem with that line of reasoning. But also, even if there is this gap, right, even if, as the government says, they're filling some gap in the record, then we just switch back to the Hashmi Padmore problem. If they need a finding on what he intended, then they could have remanded the case to the immigration judge if they think the previous finding wasn't clear enough for a clearer finding. Just like in Padmore, if they need a finding about whether he did these things, they can remand. But they can't just make their own finding even if he didn't make one. Similarly, on the taxes, the judge made a finding that petitioner had paid his taxes. The government is now objecting, oh, this finding doesn't cover these specific years. But first of all, they were overruling the immigration judge without proper clear error analysis given the 2011 deadline to file documents, given the objected to testimony about financial issues in the other testimony indicating maybe he didn't even have to pay taxes. And if there's a gap, the solution to that, under Little Roman IV of the regulation, under Hashmi, under Padmore, has to be to send the case back to the immigration judge to make the finding that the BIA thinks is missing, not to just make it themselves. I understand your tax argument. If we could just rewind for a moment to the First Amendment issue because there we sort of have a clash with Supreme Court cases and some ambiguity in between as to the scope of First Amendment rights of non-citizens. You're citing to Bridges v. Wixson, but that's 1945. Seven years later, we have the court signing off on the removal of folks who were members of the Communist Party. How do we reconcile those things? So, assuming Your Honor is referring to Harciades v. Shaughnessy, the issue there I think was that the standards for speech by everyone, both citizens and aliens, had been somewhat, I don't know whether you'd say straightened or loosened, but membership in the Communist Party, as then understood to advocate violent overthrow of the government, was a thing that the Supreme Court was saying at that time could be punished even for citizens. And so aliens under Harciades got swept into that same analysis. I don't think Harciades overturned Bridges and said something that would be lawful for a citizen is a ground of removal for an alien. I think Harciades was proceeding under the Supreme Court's then current understanding of what is lawful even for a citizen. And subsequent case law, which the BIA also failed to address in this case, has made clear in Brandenburg and Rankin and so on that the parameters for what at least citizens can say are significantly broader than what was in Harciades. I do want to emphasize, Your Honor, and I'm happy to address the first point further if Your Honor would like, but I do want to emphasize it's in effect only an argument in the alternative. We don't need to reach that if the fact-finding regulations, violations are rectified, even if the certification issue doesn't also prevail. Obviously, if that does, a lot of things don't need to be reached. But because the First Amendment violations, we assert, turn on the alleged call for violent new intifada and on the alleged association with Hamas supporters, if the court were to agree with us that the BIA could not properly derive from the immigration judge's decision those factual predicates, then the First Amendment issue wouldn't even come up. If the court disagrees with us on the factual points, then I think it becomes necessary to reach the First Amendment question where the thrust of our argument is that the BIA can't stop the case law clock in 1931, right? There's an awful lot of relevant Supreme Court precedent that they've just completely failed to address here on the First Amendment question. Interesting argument. We'll hear from you on your battle. Thank you, Your Honor. Ms. Murphy, good morning. Good morning, Your Honors. May it please the Court, Lindsay Murphy on behalf of the Attorney General. Your Honors, Congress has sharply limited the judicial review of judgments regarding the denial of adjustment of status in the context of where the denial is based on discretion, and particularly this review bar extends to factual findings. While there's a limited exception for legal questions and constitutional claims, here the petitioner has failed to raise any such colorable claims for that the Court may review. Let's talk about some of those statutory and constitutional issues that we raised with your colleague as to certification. You seem to take the position that the Board can use or could use in the past, certification jurisdiction under 1003.39 to accept an untimely appeal. Is it your position then that the immigration judge's order became final at the end of 30 days and non-final when it's certified nearly a year later, or is it that did it never become final before the Board entered its certification? Your Honor, it's the government's position that the immigration judge's decision never became final. I think a telltale sign is footnote 8, the last footnote of the immigration judge's decision where he specifically says he recognizes that this case that had been pending for well over a decade at that point had gone back and forth up to the Board of Immigration Appeals and back. He recognized that the DHS was very likely going to appeal his decision to grant adjustment of status. He withheld an order asking the DHS to reserve a visa number. With that determination, I think that's an indication that the immigration judge's decision had not yet become final. He withheld it for 30 days because that was the duration of the appeal period. He didn't withhold it indefinitely. The 30 days came and went, and nothing happened for several more months. You're correct, Your Honor, that his footnote said he was withholding it for 30 days, but there's nothing in the record indicating that he followed up to actually issue that order. His decision granting adjustment of status was not yet operable. Why does that matter, given that the language of 1255 B that speaks in mandatory terms to the Attorney General's adjustment of status and as your colleague pointed out, the CIS policy manual itself provides that if at the time of adjustment the officer did not request a visa number and DOS had not yet allocated a visa number but it was available, then CIS considers the applicant who has been lawfully admitted for permanent residence despite the error. Well, Your Honor, I think particularly with 1155 B, that statute provides that the date of adjustment shall be considered the date of the immigration judge's decision, but the government's understanding of that is that that only takes effect once the decision has become final, once there has been no appeal, once there has been no certification by the board. So that's something that can be done retroactively in the date of the adjustment. That's a leap. The regulation speaks to finality of decision except when certified to the board, the decision of the immigration judge becomes final upon waiver of appeal or upon expiration of the time to appeal. So as of March 28th of 2020, the time for appeal had run, right? Yes, I believe it was a date in April, but yes, generally correct, the 30 days. May 28th, 2020. The board had not certified the case, right? Correct, yes. And if we go forward to June of 2020, it still was not certified and the time for appeal had run, right? Yes. That's true if we fast-forward up to January of 2021. So what is the government's position as to the status of the immigration judge's order for those months, almost a full year, when there had not been a certification and the time for appeal had run? The government's position is that the immigration judge's decision still wasn't final. It was not yet operable because of these impediments that the government pointed out in the brief. So first of all, the immigration judge didn't put out an order requesting that at least a number be reserved. And in the transcript of the record, the immigration judge clearly recognized that a medical exam needed to be completed before a judgment status could be finalized. Well, you say that according to the 2016 transcript, but in 2017, there's a colloquy with the immigration judge where the judge says that he sees the medical records and fingerprints and explicitly asks the government, are we now clear? And the government says yes. Don't we have those very documents in the record before us? I would need to go back and review the record in that regard, Your Honor. But my understanding of the record is those requirements had not yet been completed. But I would have to go back and determine that. Okay. So am I understanding you correctly that in the government's view, notwithstanding 30 days having passed and there being no certification by the board, that an applicant's adjustment of status never becomes final? What does final mean? I mean, I guess that's sort of where I would ask, too. I mean, I understood you to be saying, look, it could become concluded as to part of the administrative process and discretionary function of adjustment review, but it can also not as to other parts. And so in other words, there is no global finality here in the sense that we ordinarily think of it in the law. What there are are benchmarks along the way. So I thought I understood you to be saying, yeah, it had concluded as to certain parts, but there was no universal finality that obviated the operation of the rule upon certification. I think that's correct, Your Honor. And here, because the certification regulation permits the board to go and at any time certify a case that had been before it or the immigration judge, the board was entitled or authorized assuming that the immigration judge's decision had become final and operative. The board was authorized under that regulation to go back and effectively reopen that decision and reconsider that appeal based on exceptional circumstances, which there certainly were in this case. Can I just go back because I'm not sure that you had answered my question. Is it the government's position that despite the 30 days going by and there not being certification, that in that circumstance an applicant's status is never adjusted? No, that's not the government's position, Your Honor. But what the government's position is, is that under the statute and under the regulation, given certain circumstances, the board may go and reopen a decision that had been considered final based on the certification authority. If I'm hearing you correctly then, you agree that the immigration judge's order was final. Your argument is that the BIA had the authority to reopen that decision. If the court concludes that the IJ's decision was final, then yes, we agree that the board had the authority under the certification regulation to go and reopen that decision based on exceptional circumstances. Well, I'm trying to understand the government's position because it sounded before like you were saying that the order never becomes final. The order in this particular case never became final because of the immigration judge's footnote here, basically withholding a final decision to request for DHS to request a visa number or reserve a visa number and because of the other ministerial requirements that hadn't been met. In this particular case, Your Honor, the government's position is that the immigration judge's decision never became final. But even in the event that it had become final, the certification regulation allows the board to go and reopen that decision based on exceptional circumstances. And here there certainly were. But if we get to finality and the concept of reopening, isn't that where 1256A comes into play? Congress has prescribed how you are to reopen if the immigration judge's decision is final. Yes, Your Honor. And that's the reason that we argue that the petitioner should have exhausted his argument in the petition below. The board never had an opportunity to consider whether or not the certification regulation could not be invoked because of 1256A rescission requirement. The board never had an opportunity to consider the argument that the immigration judge's decision had become final. Your adversary says, but all of that would have been futile because the board couldn't have done anything with all of that even under the particular circumstances of this case. Do you agree with that? I don't agree, Your Honor, respectfully. It wouldn't have become futile because if the petitioner had raised this objection to the board in their brief, which they had an opportunity to file and did, then the board could have stepped back and said, hey, maybe we don't have authority to certify this case. Maybe we shouldn't certify this case under the regulation because of this inconsistency that the petitioner is highlighting. But here, the petitioner never gave the board the chance to make that determination. But you said a few minutes ago that the board can certify an issue at any time. Do you mean even 10, 20 years later? The regulation doesn't impose any time limit, so yes, but that certification requirement comes also with the requirement that there be exceptional circumstances. So notwithstanding that there's a strict 30-day limit for NPL and notwithstanding that there is a standard for equitably tolling the appeal period that requires diligence and extraordinary circumstances, the board could circumvent all of that and seek to appeal an order that had become final 20 years after the fact. Hypothetically, but only provided that exceptional circumstances were present in that case, which would, in your view, be fully within the Attorney General's discretion? Yes, Your Honor. But I emphasize that that is not the case here. But it's an extraordinary position for the government to be taking, don't you think? The Congress has provided the executive through the statute with broad discretion to regulate matters of immigration. And in this particular situation where the decision has gone back and forth between the immigration judge and the board, where the party's positions were very clear and everybody, including the immigration judge, expected the board, excuse me, the DHS, to file an appeal here. There was no reliance interest by the petitioner that the court really should be concerned that he's being deprived of process that wasn't provided. Even under the, according to the assertions of the government, when DHS got the IJ's decision in July, it still waited another 30 days even to ask for a belated appeal to be accepted. And then the board waited several more months before actually certifying. And there also is some tension in the record about whether the mailing to the DHS office was the only means of service. The certificate of service says that there was also personal service. So, I mean, all of these circumstances would perhaps need to be evaluated in a way that they were not in this case. Would you agree with that? I think it's pretty clear on the record here. My reading of the certificate of service is that it was provided by mail to the petitioner and then personally served to the DHS or ICE office that was closed at the time, so it was dropped in their inbox. But it was stamped as received not until July of 2020. But I also understood the petitioner to have disclaimed any reliance on the evaluation of the exceptional circumstances. I'm not sure, can we even evaluate that? Do we even have jurisdiction to look at that question at this point, particularly since they're not raising it? No, there's no jurisdiction by this court to review the exceptional circumstances determination, which is discretionary. And as is the case with much of the most, actually all of the claims that the petitioner raises aside from the certification issue. This is a discretionary denial of adjustment of status. The court's jurisdiction is strictly limited to consideration of constitutional claims and questions of the law. And 1256 wouldn't have provided the BIA authority to re-examine or determine the suitability of that discretionary decision, right? Because it only goes to eligibility. It doesn't go to the discretionary issue that was presented here. I'm sorry, Your Honor. The point about reopening is 1256 goes, when we're going to 1256 and talking about rescission, we're talking about the eligibility for adjustment, not the discretionary decision to adjust itself, right? So resorting to 1256 in this case as opposed to certification would take you down a different legal path, not the discretionary question that was before the BIA that it wanted to review. That's correct, Your Honor. So on 1256, 1256 says that if the Attorney General discovers that at the time of the adjustment of status, the petitioner was ineligible, the Attorney General has up to five years to reopen, okay? So even in a sense, if the petitioner was ineligible at that time, then that order of adjusting status to lawful permanent resident was fundamentally flawed at the time it was rendered. People, you know, DHS wasn't aware of it, but it was, right? But even then, Congress has said you have a strict limit of five years to go back and undo what was flawed at the time that it was entered. But you're saying that despite that, the Attorney General could 20 years after the fact just say, now we're certifying a belated appeal and run around that 1256 statute and its five-year limit. Your Honor, based on the broad reading of the regulation, that is my understanding, but I emphasize that that's not an issue that the court needs to get to here because that's simply not what happened here. There was less than three months between the time that the immigration judge's decision may supposedly became final after the time for appeal ran, which I think was in May of 2020, and then in July of 2020, DHS received the immigration judge's decision and filed a notice of an appeal within 30 days, or excuse me, notice to accept the late appeal. And then the following winter, I believe in January of 2021, is when the board made its decision accepting the case on certification. So this is certainly not an instance in which the board is going to reopen a decision multiple years after the fact to take away a benefit that a petitioner would have lived in and relied upon. It was 10 to 11 months after the order would have taken effect. I think it was even less than that, Your Honor. It would have been from May of 2020 until January of 2021. Wasn't it March 10th? Excuse me. March 10th of 2021. I apologize, Your Honor. Yes. So you keep going back to the regulations, but you agree that where there is a direct conflict between a regulation and a statute, the statute controls, right? Yes, Your Honor. So where we have a regulation that talks about except when certified that the decision is final at the end of 30 days, and then we have this lengthy period where the decision is not, the case is not certified, and the time for appeal has expired, why isn't this case then controlled by 1255B with the mandatory language that the Attorney General shall record the alien's lawful admission for permanent residence as of the date of the order of the Attorney General? As I understand that regulation, Your Honor, that is something that is done, you know, that requires the government to do after the fact. So even though the immigration judge's decision may become final on a particular date, certain ministerial actions happen thereafter, and under 1255B, once those actions are completed, the date of adjustment of status is considered to be... Well, that's the key word, ministerial. There are those ministerial acts that need to take place after there has been, according to the statute, the recording of the lawful adjustment to permanent residence. Correct. But here, the immigration judge never completely finalized his decision to even order those ministerial acts to take place. He specifically withheld that by saying that he wouldn't issue that order for 30 days because he understood that the DHS would appeal. And even after 30 days had come and gone, there's nothing in the record to indicate that such an order was ever issued. For the amount of time after the IJ's order and the call for certification, I don't understand that to be relevant to the petitioner's argument, right? Because if the petitioner's right, then it doesn't matter if it's 30 minutes after the 30-day window or 30 months. Either way, that's it. There is no ability to certify. So I'm not sure what the length of time does to inform the decision. But I do understand this point that you're making to be, there are two simple pathways here. One is eligibility, the other is the discretion of adjustment. And it is entirely possible that what Congress intended was for one of those decisions to be cabined to a temporal period and the other not. That the other was always going to be in the fluid determination of the Attorney General and therefore certification is proper for a more lengthy period of time. Whereas the other technical attributes of whether or not you can in fact receive an adjustment because you are eligible, well that can be determined within a finite window. And so I'm not sure why there's tension between those two points as opposed to saying they're simply two different questions that we ask during the ongoing process of immigration review, which I think the petitioner agreed, I'd be interested in your conclusion, never really ends because there is no time at which anyone's status, even as a naturalized person, becomes completely final. They can always be reconsidered for events. So why isn't this just two different roads along the same question? Well, that may be the way to best look at it, Your Honor, because here this is a discretionary determination and you're correct in that even when granted a certain status, whether it's lawful permanent residence status, whether it's naturalization, the government does retain the power to go back and revoke that status if certain conditions are met. But doesn't it need to follow the procedures that Congress has laid out here, either rescission or a new removal action? Yes, Your Honor, but here there was no requirement because the regulation permitted the board, permits the board with unlimited time to go back and certify a decision that has come before it. And that doesn't necessarily violate the law, particularly if the immigration judge's decision is not considered final. Why would there ever be a need to invoke 1256A if the board has the unlimited discretion decades after an immigration judge's order to say we're now accepting this with our certification jurisdiction. We want to revisit the decision that was made to adjust status. And I think Your Honor points to an inherent tension between the regulation and the rescission statute, but that doesn't need to be resolved here because this is a situation where that tension, we don't reach that. I'm really interested in the language of the regulation itself, 1003.39, and how it could be that we're conditioning finality on the potential for a future certification at any point in time, even 20 years later. So is it your position that then because there could be a future certification, orders adjusting status just never become final? If exceptional circumstances are shown as required by the regulation, that is my reading and understanding of the statute. Yes, Your Honor. But that is not the situation here. So we have a presidential opinion, G. Fang v. Director of United States Immigration Customs Service, and it says that the finality of an order cannot be conditioned on something that may never happen. And it sounds like you're asking us to really undermine the concept of final orders and administrative law writ large. We're certainly not asking for that, Your Honor. What we're simply pointing to is that the board here acted within its authority under the regulation, given the exceptional circumstances, in the middle of a global pandemic where DHS was not served with a copy of the decision in a timely manner. It was providing DHS with an exception to the late filing requirement. That is the situation here. This is not a situation where the board is just sitting around going through old grants of adjustment of status, picks one out and decides, we don't really like what happened in this case. We're going to reopen it using our certification authority. That's just simply not the circumstance here. All that we're asking this court to do is to recognize the board's authority in these circumstances to use its certification authority where the petitioner never objected to it and the board never had the opportunity to consider that possible tensions. Would anything prevent the board from doing what you just posed as a counterfactual of just going through old decisions and deciding if they wanted to certify later and accept the late appeal? The requirement for exceptional circumstances would prevent them from doing that. If the board deemed the circumstances exceptional. Your Honor, I can't opine on... I find that extremely unlikely, Your Honor, but that not being this case, I can't opine on what other impediments there may be for the board to keep the board from doing that. Don't we need some principled limit if we're going to adopt the government's position here? Extending the logic from what you've said, that an immigration judge's order never becomes final because it can always be retroactively undone as a matter of extraordinary circumstances and you've also, in responding to Judge Meadey, indicated that exceptional circumstances in the government's view is entirely within the Attorney General's discretion. If any limit is there on the Attorney General reviewing the adjustment of status going back 50 years and saying I deemed it exceptional circumstances to now revisit those decisions? Your Honor, I think really what should have happened was the petitioner should have raised this... No, I'm sorry. What principled limit is there on the government taking that action? The limit is exceptional circumstances, Your Honor. Which has not been defined by the Board and you've indicated it's entirely within the Attorney General's  Except that to be your point, but that's one of the reasons why, well, maybe if this had been raised before the BIA, as it certainly could have been, because it is not some global attack on the legality of the regulations, it's simply a questioning of how the regulation operates in this particular case. The BIA may have in its review have agreed with that determination, but we're now faced with that question unexamined by the agency, and so who knows? I think the other point I understood you'd be making all along was indications of Congress's power. If there is some limit here, it seems as though it could be best filled by Congress and not the Court. So I would assume the other way that you could have in the Attorney General's discretion is Congress could say, well, this is what we want to do. I understand the alternative argument to that is, well, that's what they have and that's what these statutes mean, but I suppose the other way to look at it is, well, no, Congress hasn't kept the Attorney General's discretion when it comes to the discretionary function of adjustment, but they could, perhaps, if they wanted to, and so let that make the standard. That's where the standard of limiting principle would come from. I agree, Your Honor, and Congress has given the Executive very broad discretion over adjustment of status. Adjustment of status is the most important or significant immigration benefit short of naturalization, and it is within the Executive's purview to determine on a discretionary basis whether this is somebody that the government wants to provide permanent residence status and all of the attendant benefits that come with that or not. It's within the Executive's purview, and Congress has said that that decision really is not subject to judicial review. Just to clarify with the clerk of court, was 15 minutes added to the government time as well? Yes, thank you. If we don't have other questions at this point on certification, then why don't you move on to the other factors that were considered by the BIA? Sure, Your Honor. I'll begin with the lack of candor finding which the petitioner disputes. What the government's position is is that the board didn't misstate any of the immigration judge's findings, didn't mischaracterize the immigration judge's findings. The immigration judge made a determination in 2008 that it was unwise for Mr. Katanani not to be candid on his adjustment application by not disclosing his 1993 arrest. The immigration judge made an additional decision in 2020 that Mr. Katanani had willfully misrepresented a material fact by not disclosing his arrest. Go ahead. He said that he did not find that he intentionally misrepresented. The immigration, even in 2020, the IJ said this did cut off a line of inquiry, but he said that it was not intentional. There was a leap from that to what the board said. I didn't read the immigration judge's 2020 decision as saying it was not intentional, Your Honor. I read the 2008 decision as finding that Mr. Katanani's decision, I guess, was reasonable. A decision not to disclose that arrest was reasonable. But in the 2020 decision, the immigration judge made a determination that it was a willful misrepresentation of a material fact. First of all, I don't think the IJ said that it was an arrest. I think the IJ at least said that it was referred to it as a detention and said that it was reasonable for Dr. Katanani to understand it as a detention and not an arrest. In 2008, that was the immigration judge's finding. Did the immigration judge ever say that this was, in fact, an arrest? The immigration judge said that I think he equivocated and said arrest or detention or however you want to characterize it, he said that it was a willful misrepresentation of material fact not to disclose that, whether it was an arrest, detention, or something else. Okay. I'm going to have to pull that up. My understanding was that he specifically said that I did not find that he intentionally misrepresented anything. This was all about eligibility, too, right? I mean, the willful misrepresentation argument goes to eligibility, as I understood it. The VIA said, well, that's why it's not reaching the issue because it's not looking at eligibility. It's looking at candor. Again, I'm just not sure. I just want to make sure we're on the same page here as to what we're talking about. I understand that there are some points in the IJ's discussion of this issue that then are looked at by the VIA, but they're looking at it for a different purpose, and they're expressly disavowing reaching the willful misrepresentation point because they're not reviewing eligibility. They're looking at whether it was proper to make the adjustment of status. That's correct. Here, because the board was reviewing those findings in the discretionary context, the board was entitled to weigh those findings as a matter of judgment more heavily than the immigration judgment. But it had to weigh factual findings. It could not make its own. That's correct. It could not make its own findings, and here it did not, Your Honor. I found what I was looking for. It's on page 192 of the appendix. It says the court also does not find that Mr. Castagnani willfully misrepresented a fact material in his application for adjustment of status. Then the BIA said we find, as did the immigration judge, that the respondent intentionally was not truthful on his application for adjustment of status. Is it your view that they're viewing the facts in the same way, or that the BIA is relying on the IJ's finding of facts? The BIA is relying on the IJ's finding of facts, Your Honor. I'm sorry, I don't have the appendix with those pages before me, but I do have the immigration judge's 2020 decision on record site 436 where the immigration judge says the BIA has asked this court to examine whether failure to disclose such an incident, however it may be characterized, tended to shut off a line of inquiry relevant to his eligibility for adjustment. The court finds that it did, and then in the following paragraph, I think it goes on to explain why the immigration judge determined that the petitioner made a material misrepresentation of facts. Okay, where's the mens rea in that? Well, under the matter of DR, Your Honor, the board adopted a natural tendency test for determining materiality, and it says that misrepresentation is material if it tends to shut off a relevant line of inquiry and also would predictably have disclosed other facts relevant to the applicant's eligibility for release. So that's the effect of the misrepresentation, but what I'm asking is where in what you just read, does the misrepresentation was willful or intentional? Well, because the immigration judge made a finding of facts that the misrepresentation was material, he necessarily had to determine that it shut off a line of inquiry and that would have predictably have disclosed other facts, and I think in that word predictably is imputed a knowledge element, whether it's actual knowing or constructive knowledge. Okay, so despite what you said, he does not find that Mr. Katanani willfully misrepresented and we're going to impute that he did willfully misrepresent. I think that is the correct reading, Your Honor, and ultimately while the board didn't adopt this reasoning, the immigration judge found that the willful misrepresentation in admissibility grounds didn't apply because the petitioner had successfully rebutted the determination. I was going to ask about a very specific statement in the government's brief on page 36. It says, this is about another one of the factors, the speech in Times Square. The government says, here the board stepped into the gap left by an immigration judge who said he was in no position to decipher what Katanani's new intifada would entail. So tell me what the government means by the BIA stepped into the gap. Well, here what the board did was it found a clear error in the immigration judge's factual finding because the immigration judge I think was very reluctant to interpret what Mr. Katanani meant by calling for an intifada in Times Square. But here, because the evidence of record indicated in the very definitions that the immigration judge relied on for what intifada means, the board basically concluded it was clear error for the immigration judge to say, I don't know what his intention was, what the petitioner's intention was. Here, all of the evidence points to reliance on the ordinary meaning of the term intifada, which was entirely reasonable for the board. Was that a finding of facts by the BIA? It was a determination based on the record evidence and based on the board's determination that the immigration judge clearly erred by saying it was not possible to determine what he meant. When the IJ said I can't say what he meant, the board said that was clear error to say you can't say and then it stepped into the gap and found a fact. Yes, Your Honor. And the reason that it was clear error is because everything in the record, in the various dictionary definitions, pointed to exactly what that term means. And that is the basis for the clear error determination of the board. Is it ever appropriate for the BIA to find facts? It can be where there is no other reasonable determination or finding that could be made. Here, as the board recognized, there's really only one common understanding of intifada, given multiple definitions, given the context in which the term was used in the Times Square record. There is voluminous evidence in the record that points to examples of intifadas that have, at least in some ways, been nonviolent. Perhaps, Your Honor, but looking what this is is a discretionary determination. And here, the court should take a holistic approach in reviewing the rationale for the board's decision not to exercise discretion in the petitioner's favor. And here we have not just an isolated incidence of somebody going into Times Square and calling for an intifada, we have an incidence of someone not being fully forthcoming with their arrest or detentions, however you like to characterize it, in the West Bank on their immigration application. You have someone who has multiple connections to individuals who provide material support for Hamas through donations or through setting up an organization to do fundraising for a foreign terrorist organization. So, given this multitude of instances in which there are things that made the board uncomfortable in deciding to make a discretionary grant of adjusting the status, the board was entitled to weigh this factor against Mr. Cottenat. Because the board has so much discretion to weigh the facts, don't we need to remand if we find that there were any legal errors in what facts it assessed? You don't necessarily, Your Honor, because the board relied on a multitude of factors in reaching its discretionary determination. So, an error with respect to any one factor I would submit is not a sufficient reason to overturn the entirety of the board's decision. There are still other factors on which the board relies. But it also weighed some positive factors. The length of time that Dr. Cottenat had been in the country and community service, all of those things. So, how do we know if you take away one negative factor that it would have come to the same conclusion? Because I think the weight of the other factors are significant, Your Honor, and there really isn't a reason to undercut the board's decision or to remand the board's decision simply because the court may disagree with the propriety of one determination. Can we go back to the Times Square speech for a minute? Because I understood you'd be responding to some of the parts of the record that suggest there's perhaps ambiguity in the dictionary definition of the term intifada. But I don't think we have to look. I don't understand that the BIA was looking to the general usage in all instances. They were looking to what was meant here as ordinarily understood. And as the record states, the full quote was, our message to Palestinian authority, you have to stop all kinds of peace process. No peace process of negotiation without liberation in Palestine. Accords also have to be stopped and finished. We have to start a new intifada, intifada, intifada, and then a call and exchange of intifada, intifada. So, I don't understand the BIA to sort of be canvassing the various meanings. They're trying to hold, they're looking to what the IJ did. Well, what does as ordinarily understood that word mean according to an objective source like a dictionary? And that's they just looked at the full source of the dictionary. So, I'm not sure what all these other contextual applications might mean as opposed to this specific instance that they were reviewing, which is in the record. It's not a new fact. It is in the record. These other instances I think just simply provide support for the immigration judge's determination, including the fact that the only intifada that actually has happened that are documented in the record encompassed violence. So, it wasn't unreasonable for the board to conclude that this was not only clear error, but the only reasonable interpretation of Mr. Khatnani's words or use of that term was for calling for a violent uprising. Do you agree with this precise speech given by an American citizen would be fully protected by the First Amendment? I believe so, Your Honor. I think it would depend on the context. And if there was an incitement of violence that was part of this speech, then I think that's something that would not be protected, Your Honor. But in this situation, this isn't a situation where the petitioner's First Amendment rights would trump the executive's discretion to weigh that incident negatively in deciding whether or not to grant relief here. So, it's your view that even if this was constitutionally protected speech, that the executive can consider an adverse factor that is unconstitutional? The executive can consider an adverse factor even if that burdens certain First Amendment rights. And there's a long, decades long line of Supreme Court cases that hold precisely that. And when making a discretionary determination, the courts review, excuse me, when making a discretionary determination in the immigration context, the courts review those determinations at most whether they're facially legitimate and bona fide. But those instances are even in the context of burdens on the First Amendment rights of U.S. citizens, not with respect to individuals who are seeking a discretionary benefit in the immigration context. So, what should we make of Bridges v. Wixon, that freedom of speech in press is accorded to aliens residing in this country? Bridges v. Wixon isn't wrong, it's just not complete. It doesn't recognize the instances where the executive or Congress may impose certain limitations on speech in the immigration context because Congress and the executive have plenary authority to regulate who is admitted into this country, who may be excluded from this country. And courts have recognized that there's an exception to certain First Amendment protections in those instances. Would you like to address briefly the issues of association and taxes? Sure, Your Honor. Well, the petitioner was generally deemed credible and he admitted to donating money to the Holy Land Foundation. He admitted that the Holy Land Foundation was shut down for providing material support to Hamas, and that is documented in criminal court records. He admitted using his mosque to hold fundraisers to donate money to the Holy Land Foundation, which is found to have funneled money to Hamas. What is your answer to your colleague's point that there's no fact-finding in the record as to the timing of those donations or fundraisers relative to any determination that the Holy Land Foundation was the Well, Your Honor, it was the petitioner's burden to show that any fundraising that he did or money that he provided would have been done before any instances of the Holy Land Foundation supporting Hamas. But there is also, the court is free to take judicial notice of, I think we cited a Fifth Circuit opinion in our brief, observing that the Holy Land Foundation, the whole reason that it was set up was to funnel money to Hamas. So I would say at the very get-go, that was activity that the organization was involved in. But to be clear, the Fifth Circuit didn't make that assertion. The Fifth Circuit was recounting the government's charges in the case, right? I understood that it was an observation. Yes, Your Honor. An observation of the facts below. I'm unclear at this very moment whether that was a finding by the trial court or whether that was just an allegation. In any event, we might take judicial notice of the facts of the opinion and that the opinion says that. But are you also asking us to accept that as a fact, even if it's circuited? I don't think that you need to, Your Honor. I think there's simply the fact that the board relied on these determinations. They're not undercut by the record. The petitioner was found credible, and he admitted to each of these associations. So the board's reliance here was not improper in any way. Therefore, it was a proper consideration by the board, and the court doesn't have jurisdiction to review that because it was a discretionary determination. What are we to do with the government's argument where the record was closed as of 2011 and the government didn't raise an objection as to missing tax returns until the appeal? How can any inference be drawn there as to whether taxes were filed in the subsequent years? Well, the DHS indicated that there was a lack of Well, I guess while the record was closed, it had been reopened to submit supplemental evidence, including evidence of Mr. Katnatti's Times Square speech. So I think the petitioner bearing the burden of establishing his eligibility for adjustment, you know, it was on him, it was his burden to show that he was eligible. And he was on notice that the immigration judge had considered his tax filings previously in the lead up to the 2009 decision, so it wouldn't have been unreasonable for the petitioner to seek to submit that evidence on remand. Additionally, the DHS raised the lack of evidence of more recent tax returns in its appeal to the board, and the petitioner didn't respond to that. So the petitioner had an opportunity to respond in its appellate brief to the board. What response would you expect at that point when there was no opportunity to present evidence? Well, the petitioner could certainly have said, well, yes, I have filed tax returns. He could have appended that information to the board, even though it wasn't something that the board necessarily could consider in the first instance. It at least would have appeased the board that this is something that was not submitted maybe because the record had been closed earlier. Or the petitioner could have simply explained why no tax filings, no tax returns were filed. Could have done any of those things, but didn't. And so it wasn't improper for the board to rely on that as another discretionary matter. Can we just go back to Bridges' point for a moment? Because I wasn't as clear on how this framework operates. I understood that Bridges versus California made reference to resident aliens invoking the First Amendment in dicta. And then Wixson cites California with the same Bridges petitioner in a habeas context to say, you know, freedom of speech and press is accorded to aliens residing in the country. But then it decides the case on whether there was sufficient evidence of Communist Party affiliation. There's a whole bunch of dissents of concurrences arguing about that outcome, including, you know, a spirited dissent from Justice Murphy saying the First Amendment really should apply. So I left reading these cases thinking there really is no determinant of status on the applicability of the First Amendment at all as to all aliens. There has been discussion judicially as to what that might mean in the context of a lawful permanent resident. But is that understanding of the case law accurate? I believe it is, Your Honor. In subsequent cases that are strictly in the immigration context, they do flush that out a bit more. And particularly in Kleindienst v. Mandel in Munoz, which is a recent Supreme Court decision, excuse me, the courts recognize that there's been more than a century of unbroken precedent where the admission of an exclusion of foreign nationals is a fundamental sovereign attribute exercised by the government's political departments, largely immune from judicial control. And that even includes First Amendment rights. Then the court has gone on to assume in certain circumstances where First Amendment rights of U.S. citizens are burdened in the immigration context that there could be a facially legitimate and bona fide review. And here, we're not even talking about First Amendment rights of U.S. citizens. We're talking about potential First Amendment rights of an intending adjustment of status applicant. And so here, if anything, the court could review those determinations for facially legitimate and bona fide reasons. But, Your Honor, here, I don't even think we get to that. It's a discretionary determination that the board made to deny adjustment of status. In the court, it should conclude that it lacks judicial review. Okay. I understand the arguments. Okay. Thank you, Your Honor. Thank you. You have a few minutes on rebuttal. So, if I may go in a slightly reverse order just to address some of the things that will be most recently on your Honor's mind from the government's statements a moment ago, facially legitimate and bona fide, as the government said, is a quote from Kleindienst versus Mandel. That's about a visitor, similarly Munoz, with someone applying for initial admission to the United States. They're not talking about someone like my client who has resided here after a lawful admission for between 25 and 30 years. But that's always been challenged, though, counsel. I mean, I understand there was a lawful admission in 1996, but since 1999, the whole reason we're having this conversation is there's never been a determination. And for all of that time, the United States seems to have taken the position that lawful admittance shouldn't continue. Your Honor, the point I'm trying to make is that I don't think the constitutional rights of somebody who's been admitted and has resided here for that long are equivalent to the constitutional rights of someone seeking initial entry to present at a conference. I agree. But I do want to make sure we're on the same page here. The only reason of the length of residency is because of the challenges to the executive's determination for some, whatever we're at now, 25 plus years. I agree that the case has been going on for quite a long time, Your Honor. But that's the difference between what you're arguing. What you're saying is that there's a difference between someone who has never been paroled into the country and someone who's been here for a long time. Whatever relevance that distinction has, I don't see how it applies in this case when really there's only a three-year period of parole followed by 20 whatever years of determination by the executives that that parole should be ended. Your Honor, just, if I may, and I'm sorry, but to correct the record on that, it's not a parole. I do think there's constitutional significance to it having been admitted, as the Second Circuit has talked about, you know, people who are once admitted accrue certain additional constitutional rights. And I think the length of his residence is relevant just in that it makes clear he does reside here. He wasn't sort of visiting briefly and then returning abroad. In terms of discretion, I think Rankin, for example, makes clear from the Supreme Court that certain discretionary things still are subject to First Amendment review, right? That's the person who was fired from a job, which normally the government could do, but for a First Amendment precluded reason. With respect to the taxes, I think it's significant that the government's reduced to arguing that my client ought to have attached copies of documents to a BIA brief or made assertions about why he didn't have to pay taxes that wouldn't have been supported in the record at all because he had been denied the opportunity to testify about them. With respect to the peace process point that Your Honor brought up, I think it is important if one looks at the record that the objection, and this is covered in more detail in the op-ed at Joint Appendix 1280 to 1281, the objection to the peace process was that it was, to quote petitioners writing, all process and no peace, and that it was time to end this peace process illusion and move to a resolution based in international law and justice. I think the statement Your Honor quoted, taken out of context, could suggest that the opposite of peace, of the peace process is violence. I don't think that follows when you look at the record as a whole, which may be why the BIA did not rely on this. The BIA didn't say, because of this other sentence at the gathering, which could have been then refuted by Ms. Other Evans in the record, that's why we're interpreting intifada as violent. They took the position, rather, that I think Your Honor has suggested, that this is just the clear meaning of the word, and there I would point, as I think Her Honor had raised, to the other evidence in the record that we've discussed in great detail in our brief, that actually under certain circumstances it has been used to mean peaceful things. Going back to the certification argument, was it your view then that the BIA could make no use of that evidence in the record? Was there any determination they could make about the meaning of that word in the speech? I think they either had to accept the immigration judge's determination, or if they were of the view that the error was that he hadn't made one, remand for him to make one. I suppose if you read their decision as saying he made a firm determination that it was peaceful, but we think that's wrong, which is how I initially read it, then perhaps you're proceeding purely under the clear error prong, but then I think the problem is that as in Al-Ambayev, they've just not sufficiently justified the determination relative to all the evidence in the record to reject the immigration judge's finding. So they could rely on clear error, but in your argument it wasn't clear enough, and therefore they couldn't do it. It had the truncated meaning that the IJ used for I guess remand it for a new fact-finding? Your Honor, I think the issue is the only scenario in which they can simply reverse is where they do think he's made a clear finding on the point, and they're just saying it's clearly wrong. And I take I think it was Judge Krause's point that there's another way to read it as saying he couldn't make a determination, but if you read it that way, then I think they were required to remand. I think the only time they can just reverse on clear error is if he did make a finding, and they're saying it's clearly wrong in the opposite finding, and so they just didn't want to get caught in a loop. But I don't think, if that had happened, I think it would be clearly erroneous under Alenbaev for them to, as the government even said in its brief, substitute their judgment for that of the IJ, which is one of the things Alenbaev says is error. Going back to the certification point, the government kept talking about the judge withholding a final decision, but his decision says it's hereby ordered that the adjustment be granted. Bold footnote only refers to the ministerial tasks, as was being discussed, that 1255B say happened upon the adjustment, so afterwards. So I don't think that footnote keeps the clearly operational language in the judge's decision from operating. So the government has also said, the BIA could have said, maybe we don't have the authority under the regulation to do this because of the statutory conflict, if it had been raised below. But again, I think that's precisely what the BIA's case law says it can't say. If you read Anselmo, if you read Ponce de Leon Ruiz, the regulations promulgated by the Attorney General are binding law upon them, and they can no more attack the validity even in part of those regulations than they can attack the constitutionality even in part of a statute. The fact that we're more used to talking about something as unconstitutional than talking about something as unstatutory doesn't change the analysis here. The BIA sees them as directly analogous. So given that the government has acknowledged this hypothetical effort to exhaust would have involved asking the BIA to say, well, maybe we don't have this power under the statute, even though our regulation says they do, I think the BIA has made very clear that that's something it is simply not prepared to say. It doesn't see itself as having the legal authority to say. And I think the case law I cited earlier on constitutional challenges makes clear that as applied versus facial challenges aren't distinct in this regard. You're suggesting to us that the as applied is narrow as to the adjustment of status to LPR, but wouldn't the exact same arguments come into play any time there's a statute that would authorize relief?  Cat claim? Withholding of removal? I think that would depend on what the specific statute says about how to take the relief away. So with respect to asylum, there are specific provisions for termination. So I think a similar as applied problem would arise there, that the board would take the position on its reading of the regulation that it can go to somebody 20 years later and just terminate their asylum with the certification procedure, and that that doesn't work because section 208 of the INA, which I believe is 8 U.S.C. 1158, the asylum statute, provides for ways to terminate the status. Withholding of removal, on the other hand, I believe that INA 241 may not have any such specific provision. So as applied to withholding of removal, perhaps they can exercise this power without running into a statutory limit in the same way. But where Congress has specified how something needs to be taken away once it has been granted, I think the board has to follow the congressional pathway, even if its own regulation says it didn't. And the regulation, by the way, the regulation doesn't even mention exceptional circumstances. The government was harping on that as a possible boundary, but exceptional circumstances, as in the matter of Leodoff, is something the board just came up with in its case law. That isn't even in the regulation, let alone the statute. So I don't see how that works as a limiting principle, even were it otherwise legally permissible, which, as we've argued, it's not. The board could change that case law according to the government's interpretation, and ten years later, even with lawful permanent residence, which Congress has specifically prescribed how you take away, or even with asylum, where I believe Congress has also specifically prescribed, on the government's theory these statutes will, these statuses will be vulnerable forever. And as Your Honor pointed out, that doesn't seem to leave 1256A with any work to do. Because in these immigration court cases, how is the government ever going to be required to follow the statute of 1256A if it can simply use the certification power that it invented for itself that isn't granted in the statute, you know, isn't an exception to 1256A? The certification power, again, just so I'm making sure I understand your argument, is not plenary. It is applying to the adjustment, the discretionary adjustment decision, not looking at the eligibility power, right? And so there are still two, and I ask this question to your colleague, there are still two roads here, and I'm not sure I understand why you're always going to be able to avail yourself of the one no matter what the circumstances are. I mean, that isn't what I heard the United States saying. Your Honor, I don't think the statute divides up an adjustment into two pieces in quite the way Your Honor is suggesting, right? Yes, it's discretionary on the part of the Attorney General, but it's either happened or it hasn't under the statute, under 1255A or, again, under 1255B. Once it has happened, various ministerial acts are commanded to take place. Nothing about that statute suggests to me that half of it has happened and half of it sort of hasn't or is more reviewable than the other half. I think if anything, Your Honor's distinction really cuts the other way. 1256A makes quite clear that Congress's view is that if somebody was not in fact eligible, then their status can be rescinded. I think the obvious implication of that statutory language is that if somebody was in fact eligible, or if, as in this case, the BIA declines to opine on whether they were in fact eligible, they cannot have their status taken away simply because the relevant executive organ has second thoughts about its exercise of discretion. And that, I think, is an entirely sensible distinction for Congress to have drawn. As Your Honor has raised, for example, the analogy of denaturalization, the rules would be similar there, right? Under Congress's statutes, the executive cannot simply say, whoops, we had second thoughts. We think maybe we shouldn't have made you a citizen at all. I don't think any of us would want to live in a world where they could do that. The denaturalization statute set out a very specific burden that you're going to have to prove very specific things up to a specific standard in order to take away someone's citizenship. And our position is that it's analogous for lawful permanent residence, just as Your Honor's suggesting. The bar may be a little bit different. It may be a question of whether it's proper to frame this as second thoughts versus ongoing consideration. And I understand how you're reading the statute. I understand the United States would be reading it differently. They would say, well, this is a process that never reaches finality. It is an ongoing process of interactive dialogue, if you will, between the person who is seeking the grace of presence and continued residence and the sovereign's ability to determine whether that's a suitable determination. So I agree. If you frame it as you are, which is finality and then second guessing and undoing, it starts to seem inconsistent with the statute. But there is the alternative reading that the government seems to be urging, which is well, no, this is part of the ongoing obligation that both the executive has and that Congress has accounted for. It is entirely possible to create a different system, but it seems to me that that should be in the balance of Congress's determination rather than ours. But I understand your argument. So I think your honors positions, though, is that you now need, the Supreme Court has told us in Loper-Bright, to decide which is the better reading of the statute. And I think the better reading of 1255A and B and 1256 is that the statute does not mean what the government is suggesting that it means. I don't know that there would even be any precedential determination laying out that proposed alternate meeting that we could have deferred to in the Chevron world, but certainly now, under Loper-Bright, the court's role is to determine whether the best reading of the statutes that we've been discussing allows the board to do what it did or not. Our position is that the best reading of the statutes doesn't. Whether there might be some plausible alternate reading, I think I tend to disagree that it is plausible, but I also think that question is, in some sense, outdated. The question now isn't whether that's a plausible alternate reading of the statute. The question now, the Supreme Court has told us, is is that the best reading of the statute? And I don't think this reading of the statute that leaves people who I'm calling LPRs in limbo for 10 or 20 years where the government or the attorney general can come certify the decision and say, sorry, you were taking away your permanent residence because it was never really final to begin with, according to this alternate interpretation. I don't think that's the best reading of the statute. And I think our arguments make that fairly clear. We thank both counsel for an excellent argument today, very helpful to the Court in working through these very interesting and important issues. We will take the case under advisement, and we would request that the parties prepare a transcript with cause to be split between them. Thank you very much. Thank you.